T.C. Memo. 1997-552


UNITED STATES TAX COURT


ROBERT T. SCHIRLE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 13684-95.              Filed December 18, 1997.


<u>Gary Kuwada</u> and <u>Steve Mather</u>, for petitioner.

<u>Steven M. Roth</u> and <u>Louise C. Pais</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined the following
deficiencies in, additions to, and penalties on petitioner's
Federal income taxes:

|  |  | Additions to Tax | | | Penalties |
|  |  | Sec. | Sec. | Sec. | Sec. |
| Year | Deficiency | 6651(a) | 6653(b) | 6661 | 6663(a) |
| 1988 | $14,942 | --- | $12,811 | $3,736 | --- |
| 1989 | 39,369 | $7,597 | --- | --- | $19,961 |
| 1990 | 120,677 | --- | --- | --- | 57,533 |
| 1991 | 128,225 | 36,402 | --- | --- | 96,169 |

All section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

Petitioner, an attorney, maintained a personal injury law practice in the Koreatown section of Los Angeles. Respondent contends, among other things, that petitioner received and cashed over 160 checks throughout the years in issue, failed to report the income from these checks, and fraudulently and with the intent to evade taxes understated his income from his law practice for the years in issue. Petitioner contends that he never received the proceeds from these checks. Rather, he argues that his office manager, who had effective control of the law office, cashed the checks, paid the clients and the medical providers, and kept any remaining amounts without petitioner's knowledge.

After concessions, the issues for decision are:[1]

_____

[1] On Oct. 24, 1996, the parties filed a stipulation of settled issues. In that stipulation, the parties agreed as follows: (1) If any of the insurance settlement checks at issue in this case are found to constitute previously unreported gross receipts of petitioner for the years at issue, petitioner's gross income from each included check is equal to one-third of the face amount of the check; (2) no portion of two checks for $7,200 and $1,880 in 1989 is to be considered income to petitioner; and (3) there was a duplication of insurance settlement checks in the computation of the total amount of checks in 1990 in the amount of $15,000. Therefore, the total amount of settlement checks for 1990 should be $258,965.

On brief, petitioner admits that he omitted from income settlement checks that were deposited into his Mitsui Manufacturers Bank account in 1991.

Furthermore, respondent determined that petitioner is liable
(continued...)

(1) Whether petitioner failed to report income from his law practice in 1988, 1989, 1990, and 1991 in the amounts of $14,074, $68,648, $238,665, and $57,708, respectively;[2]

(2) whether petitioner failed to timely file his Federal income tax returns for the 1989 and 1991 tax years:

(3) whether petitioner is liable for an addition to tax for fraud pursuant to section 6653(b) for the 1988 tax year; and

(4) whether petitioner is liable for penalties for fraud pursuant to section 6663 for the 1989, 1990, and 1991 tax years.

Finally, if we decide that petitioner did not fraudulently fail to report income, we must decide whether petitioner substantially omitted gross income in 1989 and 1990 so as to render section 6501(e) applicable, and, if not, whether the limitations periods for assessing taxes for those years have expired.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts and attached exhibits are incorporated

---

[1](...continued)
for additional self-employment taxes pursuant to sec. 1402 for each of the years in issue. This issue will be resolved under Rule 155 computations for any year in which we find that there are increases in petitioner's taxable income.

[2] Respondent's determination of unreported income entails four components: (1) 162 cashed settlement checks, (2) a $3,000 cash deposit in 1989, (3) 12 checks deposited into a client trust account, and (4) a yearend ledger adjustment.

herein by this reference. Petitioner resided in North Hollywood, California, at the time he filed his petition.

Petitioner's Law Practice

Petitioner is an attorney. He was admitted to practice in California in 1978. From 1979 through 1981, he worked with another attorney in Van Nuys, California. Petitioner became a sole practitioner in 1982. His first office was in Encino, California, and in 1983, he moved to Woodland Hills, California. He kept this office open through 1991. He had no employees at either location. Petitioner handled some personal injury cases in the Encino office but did not have a negotiator. At the Woodland Hills location, petitioner sublet an office from another attorney and shared secretarial services. During 1988 and 1989, petitioner had very few clients at the Woodland Hills office, and during 1990 and 1991, he had no clients at that office.

Petitioner met Won Koo Yoon, a.k.a. Philip Yoon (hereinafter Mr. Yoon), in 1987. At that time, Mr. Yoon was working in a travel agency preparing immigration filings predominantly for Korean clients. Mr. Yoon had attended school in Korea and immigrated to the United States as a young adult. Mr. Yoon did not have a law degree, and he never worked in a law firm before meeting petitioner.

Mr. Yoon suggested that petitioner open an office in Koreatown and that Mr. Yoon could help petitioner develop a client base in the Korean community. In early 1987, petitioner

opened a law office on 7th Street in Koreatown in Los Angeles. Petitioner moved to Koreatown because he believed that the move would broaden the base of his practice in the Korean-American community. Petitioner, Mr. Yoon, and some part-time help worked at the 7th Street location. During this time, petitioner's practice consisted of immigration filings, default divorce, minor criminal matters, and a few personal injury cases. Mr. Yoon would make initial contacts with clients, obtain information from them, and act as translator.

Approximately 6 months later, in 1987, petitioner moved his practice to 3200 Wilshire Boulevard in Koreatown in Los Angeles. At the 3200 Wilshire Boulevard location, petitioner and Mr. Yoon had separate offices.

Petitioner's association with Mr. Yoon proved fruitful, and an increasing portion of petitioner's practice was devoted to personal injury matters. By 1989, petitioner was handling only occasional minor criminal matters and immigration filings. Petitioner did not have a negotiator at any of his offices in 1988.

In April or May of 1989, petitioner moved his office to 3700 Wilshire Boulevard. His office is still located there. During that time, one of Mr. Yoon's duties was to secure clients for the firm; he was very successful at this task. By 1989, petitioner's practice had expanded to a volume of more than 200 personal injury cases in the office at any point. A negotiator was hired

to deal with insurance companies. The ethnic makeup of petitioner's clientele had changed to the point that approximately 80 to 90 percent of petitioner's clients were Koreans, most of whom did not speak English. Since petitioner did not speak Korean, he was forced to rely on Mr. Yoon and employees in the office to communicate with clients. The reported gross receipts on petitioner's Schedule C grew as follows during the years in issue:

| Year | Schedule C Gross Receipts |
|------|---------------------------|
| 1988 | $73,741 |
| 1989 | 228,091 |
| 1990 | 445,551 |
| 1991 (amended) | 708,075 |

Mr. Yoon departed the firm in 1993.

Mr. Yoon's Role in the Office

It was at Mr. Yoon's suggestion and coaxing that petitioner decided to open an office in Koreatown and to develop a client base in the Korean community. From the outset, Mr. Yoon assumed a major role in the office. Mr. Yoon would make initial contacts with clients, obtain information, act as translator, and prepare much of the paperwork relating to the client's matter. Mr. Yoon's compensation in the initial stages of his arrangement with petitioner was sporadic and based on the availability of funds in the office.

Mr. Yoon was active in securing clients for the firm. Mr. Yoon would locate the client, secure the client's signature on the retainer agreement, initiate contact with the insurance

company, arrange for the client to obtain medical treatment, handle the processing of the insurance claim, prepare a list to monitor the period of limitations, review and process the mail, manage the office, make disbursements to clients, and hire, fire, and supervise employees. Petitioner also was involved in some of these activities.

Petitioner's primary role was to concentrate on litigation matters. After a negotiator was hired, petitioner's time increasingly was absorbed with the handling of litigation matters. Petitioner had very little involvement with a case prior to litigation. Petitioner often did not have any contact with clients or decide which clients the firm would represent. Petitioner relied on Mr. Yoon and other persons in the office to pursue the administrative processing of insurance claims. When cases went smoothly, petitioner typically had virtually no involvement with them.

The vast majority of petitioner's cases were non-English-speaking Korean clients, many of whom had the same last names. As a result, petitioner could not distinguish the various cases in the office.

Report of R. Gerald Markle

At trial, petitioner presented R. Gerald Markle as an expert on industry practices involving the relationships between lawyers and law firm administrators. Before entering private practice, Mr. Markle worked for the Office of Trial Counsel of the State

Bar of California from 1979 through 1986. While with the Office of Trial Counsel, Mr. Markle prosecuted over 100 formal disciplinary proceedings against California attorneys, and as a private practitioner he has defended over 200 attorneys in legal malpractice matters and formal disciplinary proceedings. Mr. Markle's expert report was submitted as his direct testimony.

In offices with a primarily Asian clientele, an Asian administrator, who frequently controls access to the client base, often becomes, in effect, the principal, while the lawyer is the administrator's employee. Mr. Yoon's dominance over the operation of petitioner's law practice, therefore, is consistent with common practice in personal injury law offices in the Los Angeles area that have primarily an Asian clientele.

Petitioner's Office Procedures

The majority of cases handled by petitioner's law firm during 1988 through 1991 involved personal injury claims. Clients came to the firm through print and television advertisements aimed primarily at the Korean community and through the efforts of Mr. Yoon. Prospective clients executed retainer agreements with the "Law Offices of Robert T. Schirle". Occasionally, petitioner was present when the client signed the retainer agreement; other times Mr. Yoon or another member of the law office, or a combination thereof, was present. A client file was established after the client signed the retainer agreement. An investigation was made, and police reports, medical records,

or other documents relating to the injury were assembled. Mr. Yoon would prepare a list of cases with the date of the injury for the purpose of monitoring the 1-year period of limitations within which to commence litigation. A representation letter was then forwarded from the firm to the insurance company to notify the insurance company of the claim. Mr. Yoon then referred the client to a medical provider for diagnosis and/or treatment. Mr. Yoon monitored and assessed the progress of the medical treatment and any property damages, and the corresponding reports were forwarded to the insurance companies. Contact was then made with the insurance adjuster in an attempt to resolve the claim. In 1988, this was done by petitioner, and from 1989 through 1991, this was done by a negotiator employed by the firm. If the negotiator reached an acceptable settlement, the settlement draft was received and a release was prepared for the client to execute. If a property damage reimbursement check was received, the entire amount of the check was forwarded to the person entitled to the amount. If a medical payment check was received, the client's signature was obtained, and the amount was deposited and held in the firm's client trust account until there was a final resolution of the claim. If a bodily injury settlement check was received, it was associated with the file along with billing statements from the medical provider. A disbursement statement was prepared identifying the amount due to the client, to the firm for fees and costs, and to the medical provider. The

client was brought into the office to execute the insurance settlement check for deposit into the firm's client trust account. The client's portion of the settlement proceeds was distributed to the client by check or in cash. If the medical provider's bill was for more than one-third of the settlement, contact was made to obtain the provider's agreement to accept only the one-third amount. If the 1-year anniversary of the accident was approaching and/or if there was no apparent ability to settle the claim, cases were reviewed for possible litigation. If necessary, petitioner prepared and filed a complaint.

Recording of Fee Income and Preparation of Tax Returns

By 1988, the income to petitioner's law practice consisted primarily of insurance settlement checks from personal injury cases. There were three major categories of insurance settlement checks: Property damage, medical payment (med-pay), and bodily injury. For property damage settlements, the check typically was deposited into the firm's client trust account, and the proper amount then was disbursed to the body shop or the client. On occasion, a check simply was endorsed over to the body shop or the client. Med-pay checks often were received in advance of the final resolution of the insurance claim. Accordingly, these checks typically were deposited into petitioner's client trust account and were held for a considerable length of time to determine whether the client ultimately was entitled to keep the med-pay amount. The firm earned no fee on med-pay amounts until

it was determined that the amount constituted part of the overall recovery of the client in the case and was not reimbursable. The office policy was for bodily injury settlement checks to be held until they were signed by the client. Then the amounts were deposited into the firm's client trust account, and a check was issued to the client for the client's portion. At some point, the amount due to the medical provider then was paid. This policy was not followed with respect to the cashed checks at issue in this case.

It was petitioner's policy not to cash insurance checks. There were a few exceptions in 1988 and early 1989 where Mr. Yoon was authorized to cash a check to pay a client who would have had difficulty negotiating the firm's check to the client. Mr. Yoon cashed such checks with the understanding that the balance would be retained by Mr. Yoon as part of his compensation. It was petitioner's understanding that even in the isolated instances in which a check was authorized to be cashed, Mr. Yoon recorded the cashed checks for the purpose of maintaining accurate books for the firm. Petitioner believed that even if these amounts were not reported in the firm's gross income, there was no change to the firm's net income because any amount that inured to the benefit of the firm was kept by Mr. Yoon as compensation.

Mr. Park prepared petitioner's Federal income tax returns for 1988, 1989, and 1990. Mr. Hwang prepared petitioner's Federal income tax return and amended return for 1991. Both Mr.

Park and Mr. Hwang, petitioner's accountants for the years in issue, were recommended by Mr. Yoon. The deposits into the client trust account were included in the general ledger as receipts of the firm.

Petitioner's 1988, 1989, and 1990 Federal income tax returns were all filed more than 3, but less than 6, years prior to respondent's mailing of the notice of deficiency on July 7, 1995. Petitioner's 1991 Federal income tax return was filed on October 15, 1992.

The 162 Disputed Checks[3]

Petitioner was aware that some of the 162 disputed checks came into his law firm. Petitioner did not personally cash settlement checks. Mr. Yoon frequently paid cash to clients of the firm. Mr. Yoon specifically instructed the firm's employees who witnessed these cash payments not to tell petitioner that cash disbursements to clients were being made. In 1988 and early 1989, petitioner authorized Mr. Yoon to cash occasional settlement checks. This policy (to petitioner's knowledge) stopped in 1989 because the office moved to a building in which one of the firm's banks was located, facilitating immediate payment or cash availability from insurance settlement checks.

---

[3] The checks in dispute are referred to by the item numbers as marked in the record. Two of the disputed checks are no longer at issue pursuant to the parties' stipulation of settled issues. Additionally, items 102 and 103 are not cashed checks but rather were deposited by petitioner into the Mitsui Manufacturers Bank account discussed infra.

Petitioner authorized Mr. Yoon to take any remaining proceeds from the authorized checks as salary.  The following table sets forth the checks which petitioner authorized Mr. Yoon to cash:

| Date Check Negotiated | Check Amount |
| --- | --- |
| 4/13/88 | $5,222.20 |
| 7/8/88 | 7,000.00 |
| 8/1/89 | 500.00 |
| 9/8/89 | 6,000.00 |
| 9/26/89 | 5,500.00 |
| 9/26/89 | 5,500.00 |
| Total | 29,722.20 |

There were two additional checks for which petitioner doubted the authenticity of his signature, but other circumstances indicated that it was the kind of check which petitioner would have authorized Mr. Yoon to cash, keeping the firm's net proceeds as compensation.  These checks are as follows:

| Date Check Negotiated | Check Amount |
| --- | --- |
| 3/21/89 | $7,000 |
| 3/21/89 | 7,000 |
| Total | 14,000 |

tems 18 through 101 and 104 through 164 were not signed by petitioner but were endorsed by a signature stamp of petitioner's name.  Petitioner never authorized the endorsement of any check by signature stamp.

The Mitsui Manufacturers Bank Client Trust Account

Petitioner had a client trust account at Mitsui Manufacturers Bank from November 30, 1987, through December 31,

1991. Initially, petitioner did not provide copies to his tax preparers of the 1988 through 1991 bank statements for this account, although he provided the 1991 statements to Mr. Hwang in late 1992. None of the deposits into this account were reflected on petitioner's 1988, 1989, 1990, and 1991 Federal income tax returns. In 1991, petitioner endorsed and deposited insurance settlement checks into his Mitsui Manufacturers Bank client trust account. The gross amounts of these checks are as follows:

| Date of Deposit | Amount |
|-----------------|--------|
| 5/20/91 | $6,700 |
| 5/20/91 | 7,000 |
| 5/20/91 | 6,500 |
| 6/26/91 | 8,000 |
| 6/26/91 | 5,750 |
| 7/17/91 | 6,500 |
| 7/17/91 | 6,800 |
| 7/17/91 | 8,750 |
| 7/17/91 | 8,750 |
| 7/17/91 | 8,750 |
| 7/17/91 | 9,600 |
| 7/17/91 | 5,000 |
| Total | 88,100 |

Petitioner also deposited $3,000 in cash to this account on March 1, 1989. These amounts also form part of respondent's adjustment to petitioner's Schedule C gross receipts.

Petitioner's Assets

During the years in issue, petitioner reported the following net income from his law practice:

| Year | Net Schedule C Income |
|------|-----------------------|
| 1988 | $10,292 |
| 1989 | 36,211 |
| 1990 | 96,945 |
| 1991 | 65,337 |

During these same years, petitioner's approximate living expenses were as follows:

|  | 1988 | 1989 | 1990 | 1991 |
|---|---|---|---|---|
| Rent | $3,000 | $3,000 | $3,000 | $3,000 |
| Living expenses | 12,000 | 12,000 | 24,000 | 24,000 |
| Car purchase | --- | --- | 10,000 | --- |
| Total | 15,000 | 15,000 | 37,000 | 27,000 |

Petitioner lived in an apartment in a commercial building owned by his parents throughout the years in issue. Petitioner did not own any real estate or stock. Petitioner did not have a gambling habit, a drug or alcohol problem, or any expensive hobbies. Petitioner did not make any charitable contributions or have any significant investments or purchases.

Mr. Yoon had two bank accounts at California Korea Bank and one account at Security Pacific Bank which had the following total deposits:

| Year | Total Deposits |
|---|---|
| 1988 | $32,480.59 |
| 1989 | 37,386.09 |
| 1990 | 181,410.86 |
| 1991 | 981,619.50 |
| Total | 1,232,897.04 |

Petitioner had Mr. Richard Rose, an accountant, prepare a summary of Mr. Yoon's bank accounts. The net amount of deposits was determined after an analysis was made by Mr. Rose to eliminate transfers between accounts, credit memos, transfers from credit cards, and redeposited checks which would normally

constitute nontaxable transfers.  Mr. Yoon also made a $100,000 downpayment on the purchase of a house in October 1990, spent $17,180 on improvements to the residence made in 1991 and paid for in early 1992, and at various times during the years in issue drove an Acura Legend, a Range Rover, and a Lexus.  Mrs. Yoon worked for a clothing manufacturer in 1988 through 1989, after which time she gave birth and was not employed.  When petitioner first became associated with Mr. Yoon, Mr. Yoon had an old automobile and no appearance of affluence.  Mrs. Yoon's parents also appeared to be of modest means.  By February 1993, Mr. Yoon had begun taking steps to relocate to Washington State.  After petitioner discovered the cashed checks in 1993, he directed the office staff to open mail and provide it directly to him and not to Mr. Yoon.

Yearend Ledger Adjustments

Most of the information necessary to complete petitioner's returns was provided to the accountants by Mr. Yoon. Petitioner was aware of a problem created by using the deposits in the client trust accounts as a starting point for the firm's gross receipts; i.e., the method overstated income by including amounts that did not belong to the firm.  There was no problem to the extent that a settlement check was received and the payments to the client and medical provider were made in the same year. The problem arose with respect to amounts collected but unreimbursed until the following year.  At various times, it

could take as long as 5 months to pay medical providers on bodily injury settlements.  An estimate was made to determine the amount of the funds held in the client trust accounts at yearend which did not belong to the firm, and this amount was backed out in determining the gross receipts on petitioner's Schedule C.  The accrual entry is the amount that petitioner backed out of gross income each year to reflect amounts that he believed did not reflect income.

The following table compares the amount of petitioner's "accrual entry" to the yearend balance in petitioner's client trust accounts for each year in which respondent has proposed an adjustment:

| Year | Petitioner's Accrual Entry | Yearend Trust Account Balance | Respondent's Adjustment[1] |
|------|---------------------------|-------------------------------|---------------------------|
| 1988 | N/A | N/A | N/A |
| 1989 | $109,000 | $112,556 | $40,750 |
| 1990 | 262,207 | 311,535 | 153,207 |
| 1991 | 100,000 | 109,208 | (162,207) |

[1] Respondent's adjustment to petitioner's yearend accrual entry is included in respondent's adjustment to petitioner's Schedule C gross receipts.

Petitioner did not review in detail each year's Schedule C prepared by the accountants but rather focused on the gross receipts and net income to determine whether the amount seemed reasonable on the basis of his recollection of the previous year and the amount of income which petitioner was able to receive from the firm.

## OPINION

Respondent based his determination of a deficiency in petitioner's 1988 Federal income tax entirely on five disputed insurance checks. After adjustments, the deficiencies for 1989, 1990, and 1991 are net amounts representing (1) one-third of the gross receipts from the remainder of the 162 disputed insurance checks, (2) respondent's reversal of petitioner's yearend ledger adjustments, which petitioner claims identify amounts in his client trust account which were not taxable receipts, and (3) insurance settlement checks deposited into the Mitsui client trust account in 1991 and a $3,000 cash deposit into that same account in 1989.

Unreported Income

Respondent, on the basis of the 162 cashed checks made out to petitioner's law firm, determined that petitioner had unreported income for each of the years in issue.

The Commissioner's determinations are entitled to a presumption of correctness. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). The burden is upon the taxpayer to demonstrate in the first instance that the Commissioner's determination is arbitrary and unreasonable in order to deprive it of the presumption of correctness. Harbin v. Commissioner, 40 T.C. 373, 376 (1963).

With respect to the years in issue, respondent presented ample evidence linking petitioner to the income from the settlement checks.  Respondent offered checks made payable to petitioner's law firm which were purportedly endorsed by petitioner.  An income tax deficiency based on petitioner's failure to report as income one-third of those checks has a rational foundation.  Therefore, the notice of deficiency is entitled to a presumption of correctness, and petitioner bears the burden of proving that no part of the checks is includable in his gross income.

Petitioner disputes respondent's income computation from the settlement checks.  He contends that he could not have earned substantially more than he reported on his returns throughout the years in issue.  In support of his position, petitioner points out that he had no asset accumulation or spending which would suggest he had income greater than he reported.  Petitioner established that his lifestyle was far from extravagant.  See Stewart v. Commissioner, T.C. Memo. 1990-264.  Petitioner's call to "Show me the money" goes unanswered by respondent.  Furthermore, petitioner's explanation of where the money went is supported by Mr. Markle's report and Mr. Yoon's significant accumulation of assets.

Petitioner relies heavily on his own testimony.  Respondent frequently reminds this Court that we are not obligated to accept

as true the uncorroborated testimony of petitioner.  See <u>Davis v. Commissioner</u>, 88 T.C. 122, 141 (1987), affd. 866 F.2d 852 (6th Cir. 1989); <u>Estate of DeNiro v. Commissioner</u>, 795 F.2d 582, 584 (6th Cir. 1986), revg. T.C. Memo. 1985-128.  Petitioner's testimony, however, generally was credible, and we rely on petitioner's testimony as it was supported by the record.  See <u>Diaz v. Commissioner</u>, 58 T.C. 560 (1972) (basing analysis upon evaluation of the entire record and the credibility of witnesses); see also <u>Estate of Neff v. Commissioner</u>, T.C. Memo. 1997-186.

In the instant case, respondent relies on the settlement checks which were made out to petitioner's law firm.  The evidence in the record indicating where the proceeds from those checks went supports petitioner's explanation that, with certain exceptions,[4] Mr. Yoon converted the proceeds to his own use without petitioner's knowledge.  We conclude, therefore, that the settlement checks cashed without petitioner's knowledge did not constitute income to petitioner within the meaning of section 61.  Cf. <u>Commissioner v. Glenshaw Glass Co.</u>, 348 U.S. 426, 431 (1955).

<u>The Mitsui Manufacturers Bank Client Trust Account</u>

---

[4] Petitioner admits that he authorized Mr. Yoon to cash certain of the disputed checks, namely items 1, 2, 9, 13, 15 and 16.  Petitioner contends that although up to one-third of the gross amount of these checks could constitute gross receipts of the firm, any such amount was given to Mr. Yoon as compensation.  Petitioner has failed to prove that any amount was paid as compensation to Mr. Yoon.

Respondent contends that one-third of the gross amounts of the deposits into the Mitsui account (except for checks totaling $17,500) represent taxable gross receipts of petitioner's law practice for the 1991 taxable year. Petitioner admits, on brief, that he omitted this income from checks that were deposited into the Mitsui account.

Yearend Ledger Adjustments

Respondent determined that petitioner's yearend adjustments to his general ledger were incorrect. Petitioner contends that these adjustments were appropriate to account for amounts held in his client trust account at the Sumitomo Bank which did not constitute income to petitioner. Petitioner contends that substantial med-pay balances existed in the client trust account in each of the years at issue.

Petitioner bears the burden of proving that these adjustments are appropriate. Rule 142(a). Petitioner relies on his own testimony that there were substantial amounts of funds in the general ledger which belonged to medical providers and doctors which support the adjustments. Petitioner claims that these adjusting entries are fully supportable in concept and amount. We disagree. In concept, petitioner is correct that not all of the funds in this account constitute income. Petitioner's adjustments excluded 96.8 percent, 84.1 percent, and 91.5 percent of the yearend client trust account balances in 1989, 1990, and

1991, respectively.  Petitioner, however, has failed to prove that more than two-thirds of the yearend balances did not constitute income.  To the extent petitioner's yearend adjustments exceed two-thirds of the yearend balances, we sustain respondent's determination.[5]

Fraud

The addition to tax or penalty in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from a taxpayer's fraud.  Helvering v. Mitchell, 303 U.S. 391, 401 (1938).  Respondent has the burden of proving, by clear and convincing evidence, an underpayment for each year and that some part of the underpayment was due to fraud.  Sec. 7454(a); Rule 142(b).  To satisfy his burden of proof, respondent must show two things:  (1) An underpayment exists; and (2) the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes.  Parks v. Commissioner, 94 T.C. 654, 660-661 (1990).  The mere failure to report income, however, is not sufficient to establish fraud.  Switzer v. Commissioner, 20 T.C. 759, 765 (1953).  If

---

[5]  Except for 1991, if no part of an underpayment for a tax year is due to fraud, respondent is barred from assessing a deficiency resulting from the yearend ledger adjustment issue pursuant to sec. 6501(a).  See discussion of limitations period, infra.

respondent establishes that any portion of the underpayment is attributable to fraud, the entire underpayment is treated as attributable to fraud and subjected to an addition to tax or penalty, except with respect to any portion of the underpayment that the taxpayer establishes is not attributable to fraud.  Sec. 6653(b)(2) for 1988; sec. 6663(b) for 1989 through 1991.

Fraud is intentional wrongdoing on the part of the taxpayer with the specific purpose to evade a tax believed to be owing. McGee v. Commissioner, 61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975).  The existence of fraud is a question of fact to be resolved from the entire record.  Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).  Respondent must meet his burden through affirmative evidence because fraud is never imputed or presumed.  Beaver v. Commissioner, 55 T.C. 85, 92 (1970).  A taxpayer's entire course of conduct can be indicative of fraud.  Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969).  Furthermore, a taxpayer's fraudulent original return is not purged by the filing of a subsequent amended return.  Badaracco v. Commissioner, 464 U.S. 386, 394 (1984).

A.    Underpayment of Tax

Respondent did not assert fraud with respect to any part of the underpayments which we have found for 1990.  We have already

concluded that petitioner underpaid his taxes in the 1988, 1989, and 1991 tax years due in part to unreported income from deposits into the Mitsui account and unsubstantiated wage deductions for amounts paid to Mr. Yoon.[6] We must now determine whether petitioner had the requisite fraudulent intent with regard to these underpayments in 1989 and 1991.

B.    Fraudulent Intent

Next, respondent must prove that a portion of each underpayment for 1989 and 1991 was due to fraud. Professional Servs. v. Commissioner, 79 T.C. 888, 930 (1982). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. DiLeo v. Commissioner, 96 T.C. 858, 874 (1991), affd. 959 F.2d 16 (2d Cir. 1992). Fraud is never presumed but, rather, must be established by affirmative evidence. Edelson v. Commissioner, 829 F.2d 828 (9th Cir. 1987), affg. T.C. Memo. 1986-223. Fraud may be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner, supra at 223-224.

---

[6] Respondent does not assert fraud with respect to the yearend ledger adjustment. Thus, the only remaining underpayments as to which respondent is asserting fraud are the $3,000 cash deposit into the Mitsui account in 1989, the checks deposited in 1991 into the same account, and the amounts from the cashed checks that petitioner claims went to Mr. Yoon as compensation.

Over the years, courts have developed a nonexclusive list of factors that demonstrate fraudulent intent.  These badges of fraud include:  (1) Understating income, (2) maintaining inadequate records, (3) failing to file tax returns, (4) implausible or inconsistent explanations of behavior, (5) concealment of income or assets, (6) failing to cooperate with tax authorities, (7) engaging in illegal activities, (8) an intent to mislead which may be inferred from a pattern of conduct, (9) lack of credibility of the taxpayer's testimony, (10) filing false documents, and (11) dealing in cash.  See Spies v. United States, 317 U.S. 492, 499 (1943); Douge v. Commissioner, 899 F.2d 164, 168 (2d Cir. 1990); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Recklitis v. Commissioner, 91 T.C. 874, 910 (1988).  Although no single factor is necessarily sufficient to establish fraud, the combination of a number of factors constitutes persuasive evidence.  Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603.  A taxpayer's intelligence, education, and tax expertise are also relevant for purposes of determining fraudulent intent.  See Stephenson v. Commissioner, 79 T.C. 995, 1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984); Iley v. Commissioner, 19 T.C. 631, 635 (1952).  We note that some conduct and evidence can be classified under more than one factor.

The list of the badges of fraud, however, is illustrative. We consider the totality of the facts and circumstances of each case to determine whether there is fraudulent intent. King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 516 (1992); Recklitis v. Commissioner, supra.

Respondent contends that the following facts, taken as a whole, prove that petitioner had the intent to fraudulently evade paying income tax on at least some part of the underpayment for the years in issue: (1) Petitioner was aware of, and was receiving the proceeds from, the settlement check cashing; (2) he was an experienced attorney; (3) he failed to maintain adequate books and records; (4) he allegedly misled the revenue agent; and (5) he dealt in cash.

As to the $88,000 in checks petitioner deposited into the Mitsui account in 1991, petitioner knew of these checks when his original and amended tax returns were filed. Additionally, we find that petitioner was aware that these checks were omitted from his return in 1991. His explanation that they were omitted due to a breakdown in communication with his accountant is unpersuasive. Petitioner may have wanted to conceal the Mitsui account from his accountant in order to prevent Mr. Yoon from learning of this account; however, that does not provide justification for omitting income. We conclude that respondent has clearly and convincingly proven fraud with regard to the

checks deposited into the Mitsui account in 1991 that represent income to petitioner.

As to the $3,000 cash deposit into the Mitsui account in 1989, respondent merely asserts it was fraudulent and discusses petitioner's alleged check cashing scheme.  Respondent provided little evidence to meet the burden of proving that any amount of this underpayment was due to fraud; therefore, we conclude that respondent has not clearly and convincingly proven fraud with regard to the $3,000 cash deposit into the Mitsui account in 1989.

As to the portion of the underpayment attributable to the amounts petitioner claimed he paid Mr. Yoon as compensation in 1988 and 1989, we find that these amounts were not omitted with the intent to evade taxes.  We conclude that respondent, therefore, has not met his burden of proving fraud by clear and convincing evidence with regard to any of the portion of the underpayment attributable to amounts petitioner claimed he paid to Mr. Yoon as compensation in 1988 and 1989.

Statutory Period of Limitations--1988, 1989, and 1990

Petitioner's returns for 1988, 1989, and 1990 were filed more than 3 years before the subject notice of deficiency was mailed on July 7, 1995.  Therefore, assessment of the deficiencies and additions determined in the notice is barred by the expiration of the statutory period of limitations on

assessments, sec. 6501(a), unless one of the exceptions to the period of limitations is applicable; see sec. 6501(c).

As we have found, petitioner did not submit a fraudulent return with the intent to evade tax for any of the tax years 1988, 1989, or 1990. Therefore, the exception contained in section 6501(c)(1) does not apply.

Respondent bears the burden of proving that the extended 6-year period of limitations specified in section 6501(e) is applicable to petitioner's 1988, 1989, and 1990 returns. Davenport v. Commissioner, 48 T.C. 921, 927-928 (1967); Quantz v. Commissioner, T.C. Memo. 1990-39. Respondent did not raise the application of section 6501(e)(1)(A) for the 1988 tax year. In an answer to petitioner's amendment to petition, respondent raised the application of section 6501(e)(1)(A) for the 1989 and 1990 tax years. Based on our findings regarding the cashed checks and the yearend ledger adjustments, respondent has failed to prove that petitioner omitted gross income in excess of 25 percent of the amount of gross income stated on his return.[7] Thus, any assessments relating to the 1988, 1989, or 1990 tax years are barred by the expiration of the period of limitations on assessment.

---

[7] Respondent did not raise the application of sec. 6501(e)(1)(A) in either of respondent's posttrial briefs. Accordingly, respondent may have intended to abandon this issue. See Callahan v. Commissioner, T.C. Memo. 1992-132.

Delinquency--Section 6651(a)

Section 6651(a)(1) provides for an addition to tax of 5 percent per month for each month or part of a month for which a return is late, the aggregate not to exceed 25 percent.

A taxpayer has a nondelegable duty to file a timely return but can avoid the addition to tax for failing to do so by affirmatively showing that the delinquency was due to reasonable cause and not due to willful neglect. Sec. 6651(a). The taxpayer bears the burden of proving both (1) that the failure did not result from willful neglect, and (2) that the failure was due to reasonable cause. United States v. Boyle, 469 U.S. 241, 245 (1985). If the taxpayer does not meet this twin burden, the imposition of the addition to tax is mandatory. Heman v. Commissioner, 32 T.C. 479 (1959), affd. 283 F.2d 227 (8th Cir. 1960).

Respondent determined that petitioner is liable for a 25-percent addition to tax under section 6651(a)(1) for the 1989 and 1991 tax years. As we have already found, the 1989 tax year is closed pursuant to the statute of limitations; therefore, we confine our discussion of the addition to tax for failure to timely file to the 1991 tax year. Petitioner's 1991 Federal income tax return was filed on October 15, 1992. There is no evidence of a request for an extension for the filing of the 1991 return. Petitioner argues that respondent has failed to

establish that an extension was not filed for 1991. Petitioner, however, bears the burden of proof on the issue. Rule 142(a).

Petitioner further contends that his return preparer informed him that an extension to file his 1991 return had been obtained through October 15, 1992. Therefore, he argues that his failure to file a timely return was due to reasonable cause. Reliance on such erroneous advice from a tax preparer is not reasonable cause. United States v. Boyle, supra at 247-248. Moreover, petitioner is an attorney and should have known of his obligation to file a timely return. Thus, "when there is no question that a return must be filed, the taxpayer has a personal, nondelegable duty to file the tax return when due." United States v. Kroll, 547 F.2d 393, 396 (7th Cir. 1977). The addition to tax pursuant to section 6651(a)(1) is sustained.

To reflect the foregoing,

Decision will be

entered under Rule 155.